IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 10, 2018

**STATE OF TENNESSEE v. EDDIE HARRIS**

**Appeal from the Criminal Court for Shelby County**
**No. 16-02944      Chris Craft, Judge**

_____

**No. W2017-01706-CCA-R3-CD**
_____

The Defendant-Appellant, Eddie Harris, was convicted by a Shelby County jury of first degree premeditated murder (counts 1 and 2), first degree murder in perpetration of robbery (counts 3 and 4), and felon in possession of a handgun (count 5), for which he received an effective sentence of life plus twelve years. See T.C.A. §39-13-202 and §39-17-1307 (2014). In this direct appeal, the Defendant argues that (1) the evidence is insufficient to support his convictions of first degree premeditated murder and first degree felony murder and (2) the trial court erred in allowing inadmissible hearsay. Upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Claiborne H. Ferguson (on appeal), and Juni S. Ganguli (at trial), Memphis, Tennessee, for the Defendant-Appellant, Eddie Harris.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This case stems from the shooting deaths of Robert DeAngelo Dale and Aaron "Rome" Moore, the victims, on February 10, 2014, at the Beacon Manor Apartments in Memphis, Tennessee. On the night of the offenses, the Defendant had been at the apartments with the victims and another friend, Andrew Barfield. Barfield left the three men to run an errand, and when he returned, the apartment was locked, the lights were turned off, and no one answered the door. Roughly twenty minutes later, a maintenance

man entered the apartment to investigate a reported water leak, which was pinkish in color, and discovered the victims had been shot. One of the victims was found dead, couched between the wall and a bed, and the other was found dying in the bathroom, where the bathroom sink lay on top of him. The Defendant was no longer at the apartment and later told family members that on the night of the offense "he had to do what he had to do" and "he had killed." Based on these events, the Defendant was subsequently charged with the above offenses. The following proof was developed at the June 28 through June 30, 2016 trial.

**State's Proof.** Temiko Davis had been friends with Victim Robert Dale since they were four or five years old, called him by his nickname "Angelo," and would see him every other day. On the day of the offense, she was with Victim Dale, and later that night, had accompanied him to Victim Moore's apartment in Beacon Manor. She had known Victim Moore for only a short time and met him through her friendship with Victim Dale. Davis testified that while at the apartment they sat, talked, and smoked marijuana. About forty-five minutes later, the Defendant arrived. Davis had known the Defendant for only a short period prior to the offense and considered him to be "an acquaintance" of Victim Dale's. She did not characterize the Defendant as a friend.

Davis explained that the Defendant had been invited to the apartment based on something that had occurred earlier that day, which made Victim Dale feel "uneasy." Davis said that the Defendant acted "strange" because he was "communicating with [her] on a level that they had never communicated on." She said the Defendant was laughing, joking, and at one point asked her to go to the store for him, which was unusual given the length of time she had known him. Davis eventually left the apartment to run an errand for Victim Dale and stopped at a store to purchase loose cigarettes for the Defendant. She returned to the apartment and four to five hours later, Andrew Barfield, Victim Dale's cousin, arrived. Moments after Barfield arrived, Davis left. She testified that the only people who remained at the apartment were Victims Dale and Moore, Barfield, and the Defendant.

Davis confirmed that on the night of the offense she observed marijuana, cocaine, and several guns at the apartment, including a large rifle and two handguns. She said that the Defendant had been using cocaine that night and that he had removed "the big rifle" from the corner and was "walk[ing] around the apartment wild with it," which made her "nervous." She also observed Victim Dale with a handgun that night and another handgun in the kitchen drawer. She acknowledged her signature on the advice of witness form and the photographic display, admitted into evidence, upon which she identified the Defendant as the individual who was with her in Victim Moore's apartment on the night of the offense.

- 2 -

Davis was notified of the offense the morning after the shootings and went to the hospital to visit Victim Dale, who was on life support. She confirmed that Victim Dale died shortly thereafter. She said she never spoke with or saw the Defendant again after the night of the offense.

On cross-examination, Davis acknowledged that she had a prior criminal history consisting of two convictions of theft. She further admitted that although the Defendant made her uncomfortable, she briefly fell asleep with him in the apartment. She agreed that she never told police officers that Victim Dale seemed scared or nervous of the Defendant. She confirmed that drugs were being sold from the apartment, and people other than the four previously testified to came to the apartment while she was there. Asked how many other people came to the apartment that night, Davis initially equivocated but later said several people came to buy drugs. The only person she recognized who came to the apartment was an individual named Rick, but she did not know his last name. She affirmed that she did not hear any arguments between Victim Dale and the Defendant while she was at the apartment that night. On redirect examination, Davis acknowledged that in her prior statement to police she emphasized that the Defendant was acting strangely, "as if he was trying to get [her] out of the apartment."

Andrew Barfield, Victim Dale's first cousin, testified that on the night of the offense, he went to "kick it" with Victim Dale at Victim Moore's apartment. When he arrived, Victims Dale and Moore, Davis, and the Defendant were there, but Davis left shortly thereafter. Barfield had met the Defendant through his cousin, Victim Dale, and had only known him for a short time prior to the night of the offense. Barfield confirmed that there was marijuana, cocaine, and three guns in the apartment. Asked if the Defendant in any way struck him as "strange" or "made [Barfield] nervous," Barfield replied,

> Yeah. He was just walking around, fidgeting, looking out the window, saying he waiting (sic) on somebody to come and get him and I was just sitting back in the chair like just looking at him. I had already had a funny feeling about him from the first two prior times that I met him.
>
> Then when he wanted me to go to the store I wasn't going to leave. I was actually n'all, I ain't fixing to go nowhere, but the only time I left was that my cousin, Robert, told me to leave. Told me to go to the store.

Barfield affirmed that it was unusual for the Defendant to ask him to do anything for him because Barfield had never done anything for the Defendant before the night of the

offense. Barfield also said that the Defendant was "shadier than me and . . . [he] just had a funny feeling about him."

Barfield eventually left the apartment when Victim Dale asked him to go to the store for condoms and cigarettes. Ten to fifteen minutes later, Barfield returned and encountered John Brumit, the apartment complex maintenance man. Brumit asked Barfield if he was going to Victim Moore's apartment and if so, could he tell Victim Moore that his water was running. The two men continued up the stairs to the apartment and knocked on the door, which was locked. Although everything was turned on when Barfield left the apartment, the television and lights had been turned off. Barfield began calling and texting Victim Dale's phone, but Victim Dale never answered.

Barfield said the maintenance man then left to go get a key to the apartment, which made Barfield nervous. Barfield explained that he wanted to notify the people inside the apartment of Brumit's entry so Brumit would not be mistaken to be the police. Barfield was also concerned that the drugs and guns in the apartment would be discovered, and he set the cigarettes and condoms under the outside window unit of the apartment and left. The next morning when Barfield discovered that Victims Dale and Moore had been shot and killed his immediate thought was, "where Eddie at[?]"

Barfield acknowledged the advice of witness form and the photographic display, admitted into evidence, upon which he identified the Defendant as the person he left Victims Dale and Moore with on the night of the offense. A photograph taken on the night of the offense showing where Barfield had left the condoms and loose cigarettes on the air conditioning unit was also admitted into evidence. On cross-examination, Barfield said that he saw Victim Dale place a .45 caliber handgun in the cushions of the couch; however, Barfield never saw the Defendant with a weapon.

John Brumit, the apartment maintenance man, testified that on the night of the offense he was lying in bed around midnight listening to music, when his next-door neighbor called and told him that there was a water leak in her bathroom ceiling. Brumit went to her apartment and observed pink water dripping from her ceiling, which was unusual. He went to the above apartment, Victim Moore's apartment, and noticed Barfield knocking on the apartment door. Brumit also knocked on the door, but no one answered. He left to retrieve a key from the office, and when he returned fifteen to twenty minutes later, Barfield was gone. Brumit and another maintenance man unlocked the apartment, heard the water leaking, and headed to the bathroom, which was located through the bedroom. In the bedroom, they observed Victim Moore on the bedroom floor with two bullet holes in his face. Brumit checked Victim Moore's pulse and confirmed that Victim Moore was dead. In the bathroom, they observed Victim Dale, who was still alive, flailing on the floor and bleeding profusely. Brumit said the bathroom sink had

been pulled off the wall and was on top of Victim Dale. Brumit moved the sink from atop the victim and called 911. Several photographs depicting the apartment and the victims as they were found that night were admitted into evidence. One of the photographs showed the "big rifle," which was positioned on the couch in the living room. Brumit said he liked Victim Moore as a person and had coffee with him every morning; however, Brumit opined that Victim Moore's apartment was being used as a "trap house" or a place where drugs may be used or sold.

Officer David Hallum of the Memphis Police Department testified that he and his partner were the first officers to respond to the scene on the night of the offense. Upon arrival, the maintenance man got his attention, and they entered the apartment. He described the scene consistently with the testimony of the maintenance man. In addition, he said although Victim Dale was still alive, he was unable to speak. In regard to weapons, Officer Hallum did not discover any guns other than the rifle in the living room on the couch. He also did not observe any cocaine or money in the apartment. Memphis Police Officer Eric Hutchison, assigned to the crime scene investigation, testified that his duties included locating, documenting, recording, and collecting evidence. During his search of the apartment, Officer Hutchison found one large rifle on the couch, but no other weapons. He recovered one .45 caliber casing in the bathroom and two in the bedroom. One of the .45 caliber projectiles had fallen from Victim Moore's body when it was being removed. Drug paraphernalia and various other items were also recovered as shown in twenty-six photographs admitted into evidence depicting the crime scene that night.

The parties entered a stipulation, exhibit 9, agreeing that Victims Dale and Moore were living persons prior to the offense and were now deceased. Doctor Erica Curry of the Shelby County Medical Examiner's Office performed the autopsy on Victims Dale and Moore. In regard to Victim Moore's autopsy, Doctor Curry observed two gunshot wounds on the right side of his face with gunpowder stippling, which meant that the end of a handgun was within inches of Victim Moore's face when he was shot. The trajectory of the bullet path was through Victim Moore's face into his neck and his spinal cord, with either wound killing him instantly. Additionally, Doctor Curry observed a graze wound to Victim Moore's right shoulder. She confirmed that Victim Moore's toxicology report was positive for cocaine and alcohol. From her tests, Doctor Curry determined that Victim Moore's cause of death was multiple gunshot wounds and the manner of death was homicide. Six photographs displaying various aspects of Victim Moore's autopsy were admitted into evidence.

In regard to Victim Dale's autopsy, Doctor Curry explained that he was taken to the hospital on the night of the offense and pronounced dead three days later. Victim Dale underwent a process by which he donated his organs before the medical examiner

performed the autopsy. Nevertheless, Doctor Curry was able to determine the cause and manner of his death. She testified that Victim Dale died as a result of a single gunshot which entered behind his left ear and lodged in the base of his brain or skull. The entry wound also had gunpowder or stippling burns. She recovered the bullet from the base of Victim Dale's brain and further observed a thermal burn on his right hand and forearm. The results from Victim Dale's toxicology were positive for metolazone and netrosed, likely administered at the hospital, and marijuana. Various photographs depicting Victim Dale's autopsy were also admitted into evidence during her testimony.

Agent Eric Warren of the Tennessee Bureau of Investigation examined the bullets recovered from the bodies of the victims and the cartridge casings recovered from the scene and opined that the bullets and cartridge casings had been fired from the same gun, a .45 automatic caliber. Three cigarette butts recovered from the scene were analyzed by Agent Kristyn Meyers of the Tennessee Bureau of Investigation. The Defendant's DNA was found on one cigarette, and DNA matching both the Defendant and Victim Moore, was found on another cigarette. Agent Meyers acknowledged this could have been due to the two men sharing a cigarette.

Detective Kevin Lundy of the Memphis Police Department homicide division was assigned to investigate the deaths of Victims Dale and Moore. He identified a phone at trial that had been turned in to the Memphis Police Department the day after the homicide. Detective Lundy testified that Angelo Murrell found the phone near Derbyshire Street, about sixty yards from Victim Moore's apartment. Detective Lundy explained this area was significant to the investigation because it was later determined that the Defendant had twice gone to a friend's mother's house on the night of the offense. Finally, Detective Lundy confirmed that no murder weapon was recovered in this case.

Angelo Murrell had been previously convicted of two counts of aggravated burglary and, at the time of trial, was on probation. He testified that on February 11, 2014, around 8:30 a.m., he was walking on Trezevant Street toward his grandmother's house located on Derbyshire and found a cell phone with no battery near the sidewalk in someone's yard. He picked up the phone, observed that it was new, and decided to keep it. Later that day, he purchased a battery for the phone, charged it, and eventually began to use it. Murrell testified that Facebook notifications were on the phone and waited for the owner of the phone to call. The next morning, Murrell observed there was a voicemail message on the phone from "the person['s] grandma saying, 'Baby, get in touch with me. Something happened in your apartment and I haven't talked to you. . . . So can you please call me.'" Murrell then went through the phone's contacts and called a contact named "girlfriend." After speaking with the girlfriend, Murrell contacted the police, showed them where he found the phone, and turned the phone in to officers.

When asked if the phone was "bloody," Murrell replied that the phone appeared "clean." He identified the phone admitted into evidence at trial as the same phone he found near Derbyshire. On cross-examination, Murrell confirmed that he was convicted of the aforementioned felonies and received probation two days after he turned the phone in to the police.

Kristin Nelson testified that on the night of the offense she was with Ricky Rogers, whom she characterized as her "friend guy." They had gone to the 24-hour Auto Zone on Summer Avenue to purchase a headlight for Rogers's new car. While Nelson and Rogers were waiting for the headlight to be installed, Nelson started receiving calls on her cell phone from an unfamiliar phone number. She confirmed her phone number at the time was ***-***-7292. She eventually answered the phone and a male voice asked to speak to Rogers.[1] Nelson gave the phone to Rogers and heard him tell the caller "don't go to my mama['s] house. I'm not at my mama['s] house." Although she heard the caller's voice, she could not hear what he said. Nelson testified that the caller "called and called and called to the point where [she] didn't feel comfortable because he was trying to get [them] to come and get [him]." She and Rogers found out about the shooting deaths of Victims Dale and Moore the next morning. She confirmed that she had a prior felony conviction of introducing contraband into a penal facility.

Memphis Police Officer Roosevelt Twilley testified that he examined the cellular phone found by Angelo Murrell and extracted the call log from February 10 and 11 between 11:35 p.m. and 12:58 a.m. During that time, the phone made eleven phone calls to the phone number ending in 7292.

Sonia Rogers testified that in 2014, she lived on Derbyshire in Memphis, Tennessee with her now deceased son, Ricky Rogers. She explained that her son was friends with the Defendant and he had been to her home at least twice prior to the offense. On February 10, around midnight, she woke up to check the doors and turn the lights off. She was then startled by a knock at her back door, and she yelled, "Who is it?" She testified that the Defendant replied, "Eddie . . . Little Ricky there?" She told him her son was not home, and the Defendant left. The Defendant returned to her home between 2:30 and 3:00 that morning asking for her son again, and she told him he was not there. This time, the Defendant asked to come inside and use her phone to call his girlfriend because his car had just stopped. She refused him entry, and the Defendant left. Although she spoke to the Defendant through the house window, she said "he just didn't

---

[1] Here defense counsel objected based on hearsay. A bench conference was held and the trial court determined that her testimony was "non-hearsay for the effect that it had on the listener . . . and not offered for the truth of the matter asserted[.]"

look his self . . . his eyes were pretty big." On cross-examination, she confirmed that she did not see any blood or weapons on the Defendant that night; he just looked "sweaty."

The Defendant's first cousin, Meosha Thomas, testified that on the evening of February 12, the Defendant showed up at her doorstep, which was "shocking because he didn't come over to [her] house." The Defendant told her, "don't believe everything you hear. . . . [T]hey said I killed some ni[----]." Thomas asked him why people would say that and the Defendant responded, "because you know, they said I was with them, you know, last." She then asked if anybody was around to witness it, and the Defendant said, "n'all (sic)." Thomas testified that she thought the Defendant was "just talking" because he seemed "high." The Defendant stayed at Thomas's house for a few more hours before leaving. Thomas saw the Defendant the next morning and gave him a ride to a gas station. Thomas said during the ride, the Defendant was "fidgety." At some point, Thomas asked the Defendant about a gun and the Defendant replied, "it's gone." The Defendant also told Thomas, "the police was (sic) at my mom's house. I gots (sic) to go." Thomas said once she dropped the Defendant off at the gas station, she told him not to come back, but he did not listen. He came back several times that same week and Thomas's boyfriend gave him a ride. During the drive, the Defendant was "ducking down in the car." Later that week, Thomas became aware that her twenty-three-year old son, Mark Thomas, was with the Defendant, and her brother, Arthur Morrison, was called to her house to help.

On cross-examination, Thomas testified that the Defendant first came to her house on February 10, before the victims were killed, and spoke to several people. She also admitted that the reason the Defendant never visited previously was because of an underlying family feud between the two sides of the family. She said, "[the Defendant] don't (sic) come around cause he don't (sic) like us." On redirect, Thomas said the family feud would not influence her to lie about the Defendant regarding murder.

Arthur Morrison, the Defendant's cousin, testified that he received a phone call on February 16 from his mother. Based on the phone call, Morrison was afraid for his nephew, Mark Thomas's life, and proceeded to drive to his sister's house. Upon arrival, he called Crime Stoppers and told them that he had information about the Defendant. Morrison eventually met with the police and agreed to cooperate with them in apprehending the Defendant. Morrison called the Defendant on the phone and told him, "his family [] name was involved and mentioned in the murder of two people and that [he] was afraid for the safety of my nephew and [he] also was afraid for [the Defendant's] safety." In response, the Defendant said, "you know, [I] had to do what [I] had to do." The Defendant then told him he had plenty of drugs, but he needed money and a ride to Nashville. The Defendant said, "[I] robbed two people and that he had to do what he had to do. He got some money and [] some drugs from the robbery." Although Morrison

discussed a plan to pick up the Defendant, the Defendant was apprehended by the police prior to reaching their meeting location. On cross-examination, Morrison testified that he and the Defendant had a close relationship. He said a few weeks prior to the crime, the Defendant had called and asked him to perform a marriage ceremony for the Defendant and his girlfriend. Morrison said that during his February 16 phone call with the Defendant, the Defendant conceded that he committed a robbery and killed.

Memphis Police Officer Robert Mear testified that on February 16, he was dispatched to the area of Sycamore View and I-40 regarding a complaint. According to dispatch, a gentleman called and said one of his family members called him asking to get a ride out of town and referenced a shooting that occurred earlier that week. Officer Mear, along with other officers, pulled over to set up a perimeter around the meeting location. However, before the meeting, officers saw the Defendant running eastbound behind some hotels. Officers chased the Defendant and located him shortly thereafter hiding behind a storage building. The Defendant was taken into custody.

**Defendant's Proof.** Vincent Harris-Henderson, the Defendant's brother, testified that there were two main sides of his family--Morrison and Harris. According to him, the two sides had feuded since the 1980s. The two sides did not gather for family reunions, did not hang out, and did not like each other. On cross-examination, Harris-Henderson acknowledged that he knew nothing about the 2014 murders. He admitted that he was not aware that the Defendant had called Morrison two weeks prior to the crime asking Morrison to marry him and his girlfriend.

Following the conclusion of the proof, the jury convicted the Defendant as charged. The State subsequently provided evidence that the Defendant pleaded guilty on October 8, 2013, to attempting to possess cocaine with intent, and the jury convicted him as charged in count 5 of being a felon in possession of a firearm. The trial court merged the first degree premeditated and first degree felony murder convictions and sentenced the Defendant to life, with a twelve-year consecutive term for the felon in possession of a handgun conviction. The Defendant filed a motion for new trial on July 11, 2016, and an amended motion for new trial on August 3, 2016, which was denied by the trial court on August 16, 2017. A timely notice of appeal was filed on August 28, 2017.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Defendant argues that the evidence is insufficient to sustain his convictions for first degree premeditated murder and first degree felony murder. Specifically, he asserts that the State failed to prove the identity of the perpetrator. The State responds, and we agree, that the evidence is sufficient to support the Defendant's convictions.

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by the appellate court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, an appellate court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The Tennessee Supreme Court has stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)).

"The identity of the perpetrator is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. In State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011), the Tennessee Supreme Court rejected the long held view that "[i]n order to convict on circumstantial evidence alone, the facts and circumstances must be so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone. A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." In doing so, Dorantes followed the federal directive that when weighing the sufficiency of the evidence, circumstantial evidence should be treated no differently than direct evidence.

Accordingly, the standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331 S.W.3d at 379 (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). First degree murder is the premeditated and

intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1) (2006). In relevant part, first degree felony murder is a killing of another person committed in the perpetration of or attempt to perpetrate robbery. Id. § 39-13-202(a)(2).

Here, the Defendant asserts that the circumstantial proof presented at trial does not "unerringly" point the finger of guilt at the Defendant, and the Defendant alone. In support of his argument, the Defendant acknowledges the standard of review regarding circumstantial evidence under Dorantes, 331 S.W.3d at 379. However, he attempts to carve out an exception for review of the element of identity based upon State v. Lajuan Harbison, No. E2015-02170-CCA-R3-CD, 2016 WL 4925632, at *4 (Tenn. Crim. App. Sept. 14, 2016), no perm. app. filed ("when identity of the perpetrator is solely based upon circumstantial evidence, the facts are required to be 'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'" (quoting State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993)). In Lajuan Harbison, the Defendant was convicted of various offenses, including attempt to commit second degree murder based largely on circumstantial evidence. On appeal, he challenged the sufficiency of the evidence supporting his convictions, arguing that the State had failed to prove the identity of the shooter. Id. at *1-3.

The panel in Lajuan Harbison properly cited Dorantes for the proposition that the standard of review is the same whether the conviction is based on direct or circumstantial evidence. However, in further addressing the issue of identity, the panel relied upon the following body of law in affirming the defendant's convictions:

> "Identity of the perpetrator is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002). *When identity of the perpetrator is solely based upon circumstantial evidence, the facts are required to be "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone."* State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993); see Reid, 91 S.W.3d at 277. "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt [.]'" Rice, 184 S.W.3d at 662 (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)).

Lajuan Harbison, 2016 WL 4925632, at *4 (emphasis added). Based on the above law, the Defendant argues that a different standard of review applies to proof of identity. We have carefully reviewed the above excerpt from Harbison and disagree. The cases relied upon in Harbison, namely Smith, predate Dorantes, which specifically rejected the

separate standard of review for circumstantial evidence. Accordingly, our review of the sufficiency of the evidence, including the element of identity, is dictated by Dorantes and remains the same whether the conviction is based upon direct or circumstantial evidence.

Based on our review, the evidence demonstrates that the Defendant was the last person with the victims at the apartment on the night they were killed. Barfield testified that he left the apartment, and when he returned ten to fifteen minutes later, the door was locked. Fifteen to twenty minutes after that, the maintenance man entered the apartment and found one of the victims had been shot and killed, and the other victim was bloodied and barely alive. Later, the Defendant showed up at Sonia Rogers's house, nearly sixty yards from the crime scene, looking for Ricky Rogers. Near Rogers's house, Murrell found a cell phone, which had numerous outgoing calls to Nelson, Ricky Rogers's girlfriend on the night of the offense. Although witnesses testified that there were drugs and handguns present in the apartment on the night of the offense, the subsequent police search did not recover any contraband. Days after the crime, the Defendant made statements to Thomas regarding the robbery and killing. The Defendant told Morrison that he "had to do what he had to do," he had "robbed two people," had received drugs and money from the robbery, and "he had killed." Although this evidence was primarily circumstantial, the jury, through its verdict, determined that the Defendant shot and killed Victims Dale and Moore, as was its prerogative. Accordingly, we conclude that the evidence was sufficient for any rational juror to find the Defendant guilty of the offenses as charged in the indictment, and he is not entitled to relief.

**II. Admission of Evidence.** The Defendant next argues that the trial court erred in allowing the testimony of Kristin Nelson regarding the substance of a phone conversation between Ricky Rogers and an unidentified male because it was inadmissible hearsay. In response, the State argues that the statements were properly admitted by the trial court as non-hearsay and for the effect it had on the listener. We agree with the State.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court's factual findings and credibility determinations in the course of ruling on an evidentiary motion, are binding on a reviewing court unless the evidence in the record preponderates against them. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015) (citing State v. Gilley, 297 S.W.3d 739, 759-61 (Tenn. 2008)). However, whether facts as found by a trial court prove that a statement was hearsay or fits under one of the exceptions to the hearsay rule are questions of law subject to de novo review. Id. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing,

offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Rule 802 states that "hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. A statement introduced for its effect on the listener is not hearsay. State v. Venable, 606 S.W.2d 298, 301 (Tenn. Crim. App. 1980); Neil P. Cohen et al., Tennessee Law of Evidence § 8.01, at 8-23 (5th ed. 2005) ("[A]ny time the statement is used to prove the hearer or reader's mental state upon hearing the declaration, words repeated from the witness chair are not hearsay . . . because [the statement] is not used to prove the truth of the matter asserted in the statement.").

At trial, Nelson testified about receiving multiple phone calls from a number she did not recognize, answering the phone, and having a male caller ask to speak with "Ricky." After Nelson was asked to testify to the substance of the conversation, defense counsel objected based on hearsay. During a bench conference, the State explained that Nelson would testify that Rogers told the person on the other end of the phone not to go to Rogers's mother's house. We note here that the transcript during the bench conference on this issue is largely indiscernible. It is unclear to this court the complete basis upon which the State offered the testimony of Nelson. It is unclear whether the trial court admitted Nelson's testimony (1) to show the effect it had on the Defendant/caller as the listener, as argued by the State; (2) to show the effect it had on Nelson as the listener; or (3) the effect it had on both Nelson and the Defendant. The trial court explicitly found that the testimony was not a declaration and admitted it as "non-hearsay for the effect that it had on the listener." The prosecutor then elicited the following testimony from Nelson:

> Q:   . . . You were handed the phone to Mr. Rogers; is that correct?
>
> A:   Yes, sir.
>
> Q:   Could you hear that the male that was on the phone saying something?
>
> A:   I could hear his voice, I couldn't tell you exactly what he was saying. I don't know.
>
> Q:   Okay. Did you hear what Mr. Rogers was saying?
>
> A:   Yes, sir. I heard his -- I heard all his responses to whatever he was conversating (sic) to him about.
>
> Q:   And what was Mr. Rogers telling this person who was calling and calling your phone?

- 13 -

Q:     A:     It was like after the fourth phone call he asked -- well, he didn't ask, Ricky was like, don't go to my mama house. I'm not at my mama house.

Q:     Don't go to my mama's house?

A:     That's exactly what he said.

Q:     I'm not at my mama's house.

A:     Yes, sir.

Nelson then said she told Rogers that she did not feel comfortable picking up the caller and the following testimony occurred:

Q:     Okay. And Mr. Roger's response other than saying don't go to my mother's house I'm not there, what else did he say?

A:     He didn't have to say anything because I told him that we was (sic) not going to pick him up because something just didn't seem right cause he kept on calling and calling and calling and calling. So to me I didn't feel right as to going to pick up this person cause (sic) I don't know who he is. So we didn't go pick him up.

To begin, we are compelled to note certain deficiencies in the Defendant's brief which complicate our review. First, the Defendant fails to explicitly provide the precise testimony he contends was inadmissible hearsay. Next, the Defendant aptly cites <u>State v. Phillip Charles Saindon, Jr.</u>, No. M2001-01860-CCA-R3-CD, 2003 WL 354508, at *1 (Tenn. Crim. App. Feb. 14, 2003), for the general proposition that Nelson's testimony was "indirect hearsay . . . cloaked behind the pretense of eliciting the effect that the statements had on [Nelson]." However, the Defendant fails to support his arguments with proper citation to that case or explain to this court how Nelson's testimony amounts to the type of indirect hearsay cautioned against in <u>Saindon</u>. Given these deficiencies, our review is somewhat limited. On this record and based solely on Nelson's testimony that Ricky Rogers said, "Don't go to my mama house. I'm not at my mama house[,]" we conclude that the trial court properly admitted Nelson's testimony as non-hearsay. It is evident that Nelson's testimony regarding the phone call was not offered to prove the truth of the matter asserted—that Ricky Rogers was not home. Accordingly, the Defendant is not entitled to relief on this issue.

- 14 -

## CONCLUSION

Based upon the foregoing reasoning and analysis, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE